THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:24-CR-207 |
| | : | (JUDGE MARIANI) |
| LAWRENCE JOSEPH HANDLOVIC, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.  INTRODUCTION AND PROCEDURAL HISTORY

On August 6, 2024, a federal grand jury returned a one-count indictment against

Defendant Lawrence Joseph Handlovic, charging Defendant with being a Felon in

Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1).  (Doc. 1).[1]

Defendant Handlovic subsequently filed a Motion to Dismiss the Indictment (Doc. 25) and

supporting brief (Doc. 26), asserting that § 922(g)(1) is facially unconstitutional, as well as

unconstitutional as-applied to the defendant, in light of the Supreme Court's decision in *New

York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).  The Government

timely filed a Brief in Opposition to the Motion to Dismiss (Doc. 34), to which Defendant filed

a Reply Brief (Doc. 37).  Defendant's Motion to Dismiss is now ripe for resolution.

---

[1] In 2008, Handlovic pleaded guilty in the Court of Common Pleas of Northampton County to manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance, pursuant to 35 P.S. § 780-113(a)(30) (*see* CP-48-CR-0001996-2008).  In 2010, Defendant pleaded guilty in the Court of Common Pleas of Northampton County to escape, pursuant to 18 Pa.C.S.A. § 5121(a) (*see* CP-48-CR-0002753-2010).

For the reasons set forth herein, the Court will deny Defendant's Motion to Dismiss the Indictment (Doc. 25).

## II. ANALYSIS

### A. Second Amendment Legal Developments – *Bruen*, *Rahimi*, and *Range II*

The Second Amendment of the U.S. Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Bruen*, the Supreme Court, consistent with its precedent, re-affirmed that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 597 U.S. at 17 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)); *see also, id.* at 8-9 ("In [*Heller* and *McDonald*] we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense.").

Although the Second Amendment confers an individual right to keep and bear arms, this right is "not unlimited". *Heller,* 554 U.S. at 595, 626. As the Supreme Court in *Heller* explained:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second

2

> Amendment, nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of firearms in sensitive places such
> as schools and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms.

*Id.* at 626-627 (internal citations omitted).  *See also*, *McDonald*, 561 U.S. at 786 ("We made

it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory

measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws

forbidding the carrying of firearms in sensitive places such as schools and government

buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'

We repeat those assurances here.") (internal citation omitted).  *Cf. United States v. Rahimi*,

602 U.S. 680, 700 (2024) ("Our tradition of firearm regulation allows the Government to

disarm individuals who present a credible threat to the physical safety of others.").

     In examining its precedent, the Supreme Court in *Bruen* set forth the appropriate test

a Court must apply in determining whether a firearm regulation violates the Second

Amendment:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text
> covers an individual's conduct, the Constitution presumptively protects that
> conduct. To justify its regulation, the government may not simply posit that the
> regulation promotes an important interest. Rather, the government must
> demonstrate that the regulation is consistent with this Nation's historical
> tradition of firearm regulation. Only if a firearm regulation is consistent with this
> Nation's historical tradition may a court conclude that the individual's conduct
> falls outside the Second Amendment's unqualified command.

*Bruen*, 597 U.S. at 17 (internal quotation marks omitted).  *See id.* at 19 ("the government

must affirmatively prove that its firearms regulation is part of the historical tradition that

delimits the outer bounds of the right to keep and bear arms."); *id*. at 24-25 (re-iterating the standard for applying the Second Amendment).  A Court must therefore first address the threshold question of whether the Second Amendment's plain text covers the individual's conduct at issue and, if it determines the conduct is covered, engage in an analysis of whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation.

Following *Bruen*, federal district courts and appellate courts throughout the United States struggled to reach consensus as to the application of the test set forth in *Bruen* to facial and as applied challenges to § 922(g) and its subsections, often reaching differing conclusions.[2]  In 2024, the Supreme Court issued its decision in *United States v. Rahimi*,

---

[2] As noted in Justice Jackson's concurrence in *Rahimi*,

When this Court adopts a new legal standard, as we did in *Bruen*, we do not do so in a vacuum. The tests we establish bind lower court judges, who then apply those legal standards to the cases before them. In my view, as this Court thinks of, and speaks about, history's relevance to the interpretation of constitutional provisions, we should be mindful that our common-law tradition of promoting clarity and consistency in the application of our precedent *also* has a lengthy pedigree. So when courts signal they are having trouble with one of our standards, we should pay attention.

The message that lower courts are sending now in Second Amendment cases could not be clearer. They say there is little method to *Bruen*'s madness. It isn't just that *Bruen*'s history-and-tradition test is burdensome (though that is no small thing to courts with heavier caseloads and fewer resources than we have). The more worrisome concern is that lower courts appear to be diverging in both approach and outcome as they struggle to conduct the inquiry *Bruen* requires of them. Scholars report that lower courts applying *Bruen*'s approach have been unable to produce "consistent, principled results," and, in fact, they "have come to conflicting conclusions on virtually every consequential Second Amendment issue to come before them". Given this, it appears indisputable that, after *Bruen*, "confusion plagu[es] the lower courts."

*Rahimi*, 602 U.S. at 741-743 (Jackson, J., concurring) (internal citations omitted). *See also*, *id*. at 745, n.3

4

602 U.S. 680 (2024), wherein it held that 18 U.S.C. § 922(g)(8),[3] was facially constitutional under the Second Amendment and constitutional as-applied to Rahimi. In so doing, the Supreme Court attempted to provide clarification to the "courts [who] have misunderstood the methodology of our most recent Second Amendment cases", *Rahimi*, 602 U.S. at 691. The Court reiterated:

> In *Heller*, our inquiry into the scope of the right began with "constitutional text and history." *Bruen*, 597 U.S., at 22, 142 S.Ct. 2111. In *Bruen*, we directed courts to examine our "historical tradition of firearm regulation" to help delineate the contours of the right. *Id.*, at 17, 142 S.Ct. 2111. We explained that if a challenged regulation fits within that tradition, it is lawful under the Second Amendment. We also clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to "justify its regulation." *Id.*, at 24, 142 S.Ct. 2111.

―――――――――――――

("[W]hat we see now is that *Bruen*'s history-and-tradition test is not only limiting legislative solutions, it also appears to be creating chaos.").

[3] Pursuant to 18 U.S.C. § 922(g)(8):

It shall be unlawful for any person . . . who is subject to a court order that—

**(A)** was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
**(B)** restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
**(C)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
**(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; . . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(8).

*Rahimi*, 602 U.S. at 691.  The Supreme Court in *Rahimi* further provided guidance to the lower courts with respect to the appropriate analysis when considering whether a challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition.  *Id*. at 691-692.

Following *Rahimi*, the Third Circuit Court of Appeals issued an *en banc* decision in *Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) (hereinafter *"Range II"*).  There, Plaintiff Bryan Range sought a declaration that § 922(g)(1) violated the Second Amendment as-applied to him and requested an injunction prohibiting the law's enforcement against him.[4]  Applying the principles of *Bruen* and *Rahimi*, as well as prior Supreme Court precedent, the Third Circuit first answered in the affirmative the "threshold question" of whether Range is one of "the people" protected by the Second Amendment, rejecting the Government's contention that "felons are not among 'the people' protected by the Second Amendment." *Range II*, 124 F.4th at 228.  The Circuit Court then turned to the first step of the *Bruen* analysis – whether the Second Amendment's plain text covers the individual's conduct at issue – finding that § 922(g)(1) regulates Second Amendment conduct and that

---

[4] On June 3, 2023, the Third Circuit Court of Appeals *en banc*, applying *Bruen*, found that the Nation's historical tradition of firearms regulation did not support depriving Plaintiff Bryan Range of his Second Amendment right to possess a firearm, explaining that "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (hereinafter "*Range I*").  Following *Rahimi*, the Supreme Court vacated the judgment and remanded *Range I* to the Third Circuit Court of Appeals for further consideration, *see Garland v. Range*, 144 S.Ct. 2706 (Mem.) (2024).  Applying both *Bruen* and *Rahimi*, the Third Circuit Court of Appeals thereafter issued *Range II*, wherein it reached the same conclusion.

Range's request to possess a rifle to hunt and a shotgun to defend himself at home "tracks the constitutional right as defined by *Heller*" and therefore presumptively protects Range's conduct. *Id.*

Having determined that Range's conduct was protected by the Second Amendment, the Circuit Court engaged in the second step dictated by *Bruen*: an analysis of whether the Government had "shown that applying § 922(g)(1) to Range would be 'consistent with the Nation's historical tradition of firearm regulation.'" *Range II*, 124 F.4th at 228 (quoting *Bruen*, 597 U.S. at 24). The Third Circuit rejected each of the Government's arguments, including its proposed historical analogues and held that "the Government has not shown that the principles underlying the Nation's historical tradition of firearms regulation support depriving Range of his Second Amendment right to possess a firearm." *Id.* at 232.

### B. Defendant's Facial Challenge to 18 U.S.C. § 922(g)(1)

A facial challenge to a legislative Act "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Thus, to defeat a facial challenge, "the Government need only demonstrate that [the Act] is constitutional in some of its applications." *Id.*

Pursuant to § 922(g)(1), "[i]t shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[,] . . . to ship or transport in interstate or foreign commerce, or possess in or affecting

commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). "Section 922(g)(1) is a straightforward 'prohibition[ ] on the possession of firearms by felons.'" *Range II*, 124 F.4th at 229 (quoting *Heller*, 554 U.S. at 626).

Here, without citation to *Rahimi* or *Range II*, Defendant asserts that § 922(g)(1) is facially unconstitutional following the Supreme Court's decision in *Bruen*. (*See generally*, Docs. 25, 26). However, neither *Bruen* nor *Rahimi* invalidated or overturned the legal principles and analysis set forth in *Heller* and *McDonald*, but instead, relying on those two cases, clarified the appropriate test that must be applied in addressing Second Amendment challenges to firearms regulations. In *Bruen*, the Court rejected the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny" that had been applied by the lower courts after *Heller* and *McDonald*, holding that the second-step – application of a "means-end" analysis – "is one step too many." *Bruen*, 597 U.S. at 17-19. In so doing, the *Bruen* Court emphasized that "[s]tep one of the predominant framework [determining whether regulated conduct falls beyond the Second Amendment's original scope] is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*. at 19. The Supreme Court in *Bruen* and *Rahimi* made great effort to avoid undermining its prior decisions in *Heller* and *McDonald* and to repeatedly underscore the continued validity of

those decisions.  *See e.g., Bruen*, 597 U.S. at 26 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id*. at 27 ("*Heller* itself exemplifies" the straight-forward inquiry into the Second Amendment's text and historical understanding); *id*. at 29 ("*Heller* and *McDonald* point toward at least two metrics [to assess whether a historical regulation is a proper analogue for a modern firearm regulation]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").  *See also, e.g., Rahimi*, 602 U.S. at 690-691 ("'Like most rights,' though, 'the right secured by the Second Amendment is not unlimited.' [*Heller*, 554 U.S. 570 at 626].  In *Heller*, this Court held that the right applied to ordinary citizens within the home.  Even as we did so, however, we recognized that the right was never thought to sweep indiscriminately.  'From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' *Ibid*."); *id.* at 693-694 ("This Court reviewed the history of American gun laws extensively in *Heller* and *Bruen*.  From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others."); *id*. at 699 ("*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home.  In fact, [*Heller*] stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'").

Thus, this Court does not now engage in an uninformed analysis in determining whether the Second Amendment's plain text covers the possession of a firearm by a felon, or at minimum, a sub-category of felons, and if so, whether the Government has affirmatively demonstrated that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation, where the Supreme Court in *Bruen and Rahimi* has already signaled the answer to this question.

The Court in *Heller* made clear that the rights secured by the Second Amendment are not unlimited, enumerating a number of examples including the "longstanding prohibitions on the possession of firearms by felons". *Heller*, 554 U.S. at 626-627. Despite Defendant's suggestion to the contrary, *Bruen* did not undermine the Court's statement in *Heller*, nor did the Supreme Court's subsequent decision in *Rahimi*. *Bruen*, quoting *Heller*, re-iterated that "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635) (italics in original). The *Bruen* decision further stated that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 38. This observation in *Bruen* is entirely consistent with

*Heller*'s recognition of the legality of the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government building. . ." *Heller*, 554 U.S. at 626-627. [5]

---

[5] The conclusion that *Bruen* does not disturb the prior analyses of *Heller* and *McDonald* is further supported by the concurrences and the dissent in *Bruen*. Justice Alito, in his concurrence, specifically noted the following:

> Our holding [in *Bruen*] decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or [McDonald] about restrictions that may be imposed on the possession or carrying of guns.

*Bruen*, 597 U.S. at 72 (Alito, J., concurring) (underline added). Justice Kavanaugh, with whom Chief Justice Roberts joined, wrote separately "to underscore two important points about the limits of the Court's decision" in *Bruen*. The second point reads as follows:

> *Second*, as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment "is neither a regulatory straightjacket nor a regulatory blank check." . . . Properly interpreted, the Second Amendment allows a "variety" of gun regulations. *Heller*, 554 U.S. at 636, 128 S.Ct. 2783. As Justice Scalia wrote in his opinion for the Court in *Heller*, and Justice ALITO reiterated in relevant part in the principal opinion in *McDonald*:
>
> > "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.... [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.] . . .

*Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring). Justice Breyer, in his dissenting opinion, agreed with Justice Kavanaugh, stating that "[l]ike Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding" addressing presumptively lawful firearm restrictions, including the prohibition of the possession of a firearm by a felon, *id*. at 129-130 (Breyer, J., dissenting).

That Justices Kavanaugh, Roberts, and Alito each determined the need to highlight the particular language in *Heller* setting forth certain presumptively lawful "longstanding prohibitions" demonstrates a desire to make clear the limits of the Supreme Court's decision in *Bruen* and to emphasize the remaining

Although in a more limited context, the *Rahimi* Court also confirmed the continued

constitutionality of prohibitions on the possession of firearms by certain individuals.  Citing to

*Heller* and consistent with *Heller*'s recognition of the existence of the "longstanding

prohibitions on the possession of firearms by felons and the mentally ill. . .", *Heller*, 554 U.S.

at 626, the *Rahimi* Court was careful to make clear that it was "not suggest[ing] that the

Second Amendment prohibits the enactment of laws banning the possession of guns by

categories of persons thought by a legislature to present a special danger of misuse",

*Rahimi*, 602 U.S. at 698.  *See also, id.* at 699 (noting that *Heller* is consistent with the

Court's holding in *Rahimi* where "*Heller* never established a categorical rule that the

Constitution prohibits regulations that forbid firearm possession in the home . . . [but

instead] stated that many such prohibitions, like those on the possession of firearms by

'felons and the mentally ill,' are 'presumptively lawful.'"); *id.* at 735-736 (*Rahimi* "carefully

builds on *Heller*, *McDonald*, and *Bruen*. The Court applies the historical test that those

precedents have set forth – namely, whether the new law is relevantly similar to laws that

our tradition is understood to permit.  The Court examines our historical tradition of firearm

regulation, and correctly holds that America's tradition of firearm regulation allows the

Government to disarm individuals who present a credible threat to the physical safety of

others.") (Kavanaugh, J., concurring) (internal citations and quotation marks omitted).

---

viability of the Supreme Court's statements in *Heller* and its progeny as to specific conduct which falls
outside of the protection of the Second Amendment and which may be properly curbed by firearm
regulations.

*Bruen* did not overturn, abrogate, or otherwise suggest that the longstanding prohibitions identified in *Heller*, including the prohibition of possession of firearms by felons, were no longer lawful. However, *Rahimi* arguably narrowed the scope of the specific category of individuals who may be barred from possessing a firearm by focusing on the individual's threat to the physical safety to other individuals or physical threat to the community. *See Rahimi*, 602 U.S. at 691 ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms."); *id.* at 700 ("our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not."); *id.* at 693 ("the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others."); *see also, id.* at 700. However, when evaluating this language in the context of a facial challenge to § 922(g)(1), it is beyond dispute that a number of felonies can be properly categorized as violent or allowing a permissible inference that the convicted felon poses a physical danger to a specific person or to the community.

Post-*Rahimi*, the Third Circuit has repeatedly cautioned in precedential opinions that the disarmament of, at least certain, felons remains constitutional. As noted by the Court in *Range II* in December of 2024:

> [A]s the plurality stated in *Binderup*: "That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical." [*Binderup v. Att'y Gen.*, 836 F.3d 336, 344 (3d Cir. 2016) (Ambro, J.)]. That statement tracks then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, in

which she persuasively explained that "all people have the right to keep and bear arms," though the legislature may constitutionally "strip certain groups of that right." 919 F.3d 437, 452 (7th Cir. 2019). We agree with that statement in *Binderup* and then-Judge Barrett's reasoning.

124 F.4th at 226-227.  Less than two months later, the Third Circuit in *Pitsilides v. Barr*, explained:

> while *Rahimi* and *Range II* did not purport to comprehensively define the metes and bounds of justifiable burdens on the Second Amendment right, they do, at a minimum, show that disarmament is justified as long as a felon continues to 'present a special danger of misus[ing firearms],' *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, in other words, when he would likely 'pose[ ] a physical danger to others' if armed, *Range II*, 124 F.4th at 232.

128 F.4th 203, 210 (3d Cir. 2025).  *See also, United States v. Quailes*, 126 F.4th 215, 219 & n.5 (3d Cir. 2025) (quoting *Heller*'s caution that "nothing in [its] opinion should be taken to cast doubt" on laws like § 922(g)(1) that prohibit "the possession of firearms by felons" and recognizing that *Heller* "declared the 'longstanding prohibitions on the possession of firearms by felons' to be 'presumptively lawful.'" . . .  When the Supreme Court held that the Second Amendment applies to the States in *McDonald v. City of Chicago*, it 'repeat[ed] those assurances,' as it has continued to do in its most recent Second Amendment case . . .", citing *Rahimi* and *Bruen*).

Where a facial challenge to a legislative Act requires a defendant to establish that no set of circumstances exists under which the Act would be valid, *Rahimi*, 602 U.S. at 693, upon review of the Supreme Court's decisions in *Heller* and its progeny, as well as the Third Circuit's application of recent Supreme Court precedent, it is evident that at least some set

of circumstances exist under which § 922(g)(1) is valid.  Defendant's motion to dismiss the Indictment on the basis that § 922(g)(1) is facially unconstitutional will thus be denied.

### C. Defendant's As-Applied Challenge to 18 U.S.C. § 922(g)(1)

In addition to asserting that § 922(g)(1) is facially unconstitutional, Defendant Handlovic argues that § 922(g)(1) is unconstitutional as-applied to him.

Whereas "[t]o prevail on a facial challenge [to a statute], a plaintiff must 'establish that no set of circumstances exists under which the [law] would be valid,'" the standard for bringing an as-applied challenge "is less demanding; a plaintiff need only show that a law's 'application to a particular person under particular circumstances deprived that person of a constitutional right.'" *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 134 & n.7 (3d Cir. 2022) (quoting *Salerno*, 481 U.S. at 745 then *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)).

Federal Rule of Criminal Procedure 12(b)(3)(B) requires that all motions alleging a defect in the indictment, including a failure to state an offense, must be raised prior to trial. Fed. R. Crim. P. 12(b)(3)(B); *id.* at 12(b)(3)(B)(v).  On a Rule 12(b)(3)(B) motion, the Court's analysis involves a determination as to whether the allegations contained in the indictment are sufficient to charge the suspect with a particular offense.  *See United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000) (citing *United States v. Sampson*, 371 U.S. 75, 78-79 (1962)).  "In considering a defense motion to dismiss an indictment, the district court accepts as true the factual allegations set forth in the indictment." *United States v.*

*Besmajian*, 910 F.2d 1153, 1155 (3d Cir. 1990) (citing *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n.16 (1952)).

Here, Handlovic does not dispute the Government's assertion in its brief in opposition to Defendant's motion to dismiss (Doc. 34) that he was previously convicted in Pennsylvania state court of Manufacture/Delivery/Possession with Intent to Manufacture/Deliver a controlled substance in 2008 and of Escape in 2010, both felonies (*id.* at 3-4), but contends in his Reply brief that, where the Indictment does not set forth these specific prior felonies, the Court may not consider them in deciding the present motion because they consist of "facts outside of the indictment" (Doc. 37, at 1). Courts have repeatedly rejected the suggestion that they may not take judicial notice of prior convictions in deciding a motion to dismiss an indictment. *See e.g. United States v. Mollett*, 2025 WL 564885, at *4 (W.D. Pa. 2025) ("[T]here is precedent, with which this Court agrees, for considering a defendant's criminal record when analyzing an 'as-applied challenge to a pending charge under § 922(g)(1).'") (quoting *United States v. Adams*, 2024 WL 54112, at *2 (M.D. Pa. 2024)); *Adams*, 2024 WL 54112, at * 2 ("Following *Range* [*I*], numerous decisions in the district courts have looked beyond the indictment to determine whether § 922(g)(1) is unconstitutional as applied to each of those defendants on motions to dismiss or subsequent motions for reconsideration.") (collecting cases). *Cf. United States v. Williams,* 113 F.4th 637, 662 (6th Cir. 2024) ("Nor is it a problem – statutory or evidentiary – that the government failed to list a specific predicate felony in his indictment. From a

statutory standpoint, the 'specific name or nature' of a defendant's prior felony conviction isn't an element of § 922(g)(1)."); *id.* at 660, 662 (explaining that "Courts may consider any evidence of past convictions in the record, as well as other judicially noticeable information – such as prior convictions – when assessing a defendant's dangerousness" and that "a court can accept prior convictions without an evidentiary hearing or jury fact finding.").  This Court therefore finds that the Government's failure to set forth one or both of Handlovic's prior felony convictions in the Indictment does not require dismissal of the Indictment in this action and that the Court may take these felony convictions into account when deciding Defendant's as-applied challenge.

Defendant's brief in support of his motion to dismiss does not set forth with any particularity the basis for his as-applied challenge, separate from his arguments supporting his facial challenge.  In particular, Defendant fails to identify with any specificity why § 922(g)(1) is unconstitutional as-applied to Handlovic, as opposed to any other felon. Although Defendant has provided no basis for this Court to engage in a separate analysis as to the constitutionality of § 922(g)(1) as-applied to Handlovic, the Court will nonetheless undergo such an analysis, applying the guidance of *Bruen*, *Rahimi*, and the Third Circuit's precedent applying the recent developments in Second Amendment law, albeit without any direction from Defendant as to the basis for his as-applied challenge.

As a preliminary matter, it is evident that Handlovic is considered one of "the people" protected by the Second Amendment.  *See Range II*, 124 F.4th at 228 (rejecting

Government's contention that felons are not among the "people" protected by the Second Amendment). This Court further assumes for purposes of this analysis that the Second Amendment's plain text covers Handlovic's conduct, *i.e.* his possession of a firearm. The Court thus examines the central issue: whether the application of § 922(g)(1) to Defendant Handlovic is consistent with this Nation's historical tradition of firearm regulation.

The *Bruen* Court provided guidance to aid courts in determining whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation, explaining that "[i]n some cases," the inquiry that courts must undertake to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding "will be fairly straightforward", *Bruen*, 597 U.S. at 26.

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 26-27.

The Court in *Bruen* nevertheless recognized that while some "historical analogies . . . are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27. "The

regulatory challenges posed by firearms today are not always the same as those that

preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately,

the Founders created a Constitution – and a Second Amendment – intended to endure for

ages to come, and consequently, to be adapted to the various crises of human affairs.

Although its meaning is fixed according to the understandings of those who ratified it, the

Constitution can, and must, apply to circumstances beyond those the Founders specifically

anticipated." *Id*. at 27-28 (internal quotation marks and citations omitted). Thus,

> When confronting such present-day firearm regulations, this historical inquiry
> that courts must conduct will often involve reasoning by analogy – a
> commonplace task for any lawyer or judge. Like all analogical reasoning,
> determining whether a historical regulation is a proper analogue for a distinctly
> modern firearm regulation requires a determination of whether the two
> regulations are "relevantly similar." And because "[e]verything is similar in
> infinite ways to everything else," one needs "some metric enabling the
> analogizer to assess which similarities are important and which are not[.]"

*Bruen*, 597 U.S. at 28-29 (internal citations omitted). "[A]nalogical reasoning requires only

that the government identify a well-established and representative historical *analogue*, not a

historical *twin*." *Id*. at 30 (italics in original). Further, the *Bruen* Court, while declining to

"provide an exhaustive survey of the features that render regulations relevantly similar

under the Second Amendment", reasoned that:

> *Heller* and *McDonald* point toward at least two metrics: how and why the
> regulations burden a law-abiding citizen's right to armed self-defense. As we
> stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the
> *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at
> 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); *see also*
> *id.,* at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central
> to the Second Amendment right"). Therefore, whether modern and historical

regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry.

*Id*. at 29 (italics in original).

Two years later, in attempting to provide clarification of its decision in *Bruen* and resolve the "misunderstanding" of the lower courts of the Supreme Court's Second Amendment methodology following *Bruen*, the *Rahimi* Court explained:

These precedents [*Heller* and *Bruen*] were not meant to suggest a law trapped in amber. As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. 554 U.S. at 582, 128 S.Ct. 2783. Rather, it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence." *Ibid*. By that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.

As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. 597 U.S. at 26–31, 142 S.Ct. 2111. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id*., at 29, 142 S.Ct. 2111. Discerning and developing the law in this way is "a commonplace task for any lawyer or judge." *Id*., at 28, 142 S.Ct. 2111.

Why and how the regulation burdens the right are central to this inquiry. *Id*., at 29, 142 S.Ct. 2111. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." *Id*., at 30, 142 S.Ct. 2111.

> The law must comport with the principles underlying the Second Amendment,
> but it need not be a "dead ringer" or a "historical twin." *Ibid*. (emphasis deleted).

*Rahimi*, 602 U.S. at 691-692.

In the present case, the Government argues that § 922(g)(1) is constitutional as applied to Handlovic because "[t]ext, history, and tradition reflect that legislatures may disarm persons who have committed serious crimes and persons whose possession of firearms would endanger themselves or others." (Doc. 34, at 11). In support of this assertion, the Government presents a series of 17th, 18th, and 19th century purported historical analogues wherein statutes and state laws disarmed individuals who had committed serious crimes or were deemed dangerous or unlikely to abide by the law. (*See id.* at 12-20).[6]

The Government's position is strongly supported by the Supreme Court's recent decision in *Rahimi* and the Third Circuit's subsequent decisions. In *Rahimi*, following a detailed historical survey of the "going armed" laws and surety laws of the 1700 and 1800s,

---

[6] Although the crime of escape was a general societal problem regulated in colonial times, the same cannot be said for crimes involving the illegal possession and/or distribution of a controlled substance. In determining whether § 922(g)(1) is unconstitutional as applied to a person convicted of an offense involving a controlled substance like Handlovic, the Court must determine whether there are "unprecedented societal concerns" that justify the disarmament of those who have engaged in this crime in modern times. As the Supreme Court acknowledged in *Bruen* and *Rahimi*, the right to bear arms has been subject to restrictions governing the intent for which firearms could be carried. In light of the unprecedented concerns regarding the need to disarm those who would use firearms in furtherance of a criminal purpose, *Bruen* specifically recognized that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms", 597 U.S. at 38; *see also*, *Rahimi*, 602 S.Ct. at 691 (citing its reasoning in *Heller* and reiterating that the right secured by the Second Amendment is not unlimited and that right "was never thought to sweep indiscriminately").

the Supreme Court explained:

> Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed. . . [Section 922(g)(8)'s] prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent.
>
> Like the surety and going armed laws, Section 922(g)(8)(C)(i) applies to individuals found to threaten the physical safety of another. This provision is 'relevantly similar' to those founding era regimes in both why and how it burdens the Second Amendment right. Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do.

*Rahimi*, 602 U.S. at 698 (internal citations omitted). *See id*. at 690 ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms."); *id*. at 693 ("[T]he Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others."); *id*. at 700 ("[O]ur Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not.").

Relying on *Bruen* and *Rahimi*, the *Range II* Court utilized "dangerousness" as the touchstone for determining whether applying § 922(g)(1) to a specific felon "would be 'consistent with the Nation's historical tradition of firearm regulation.'" *Range II*, 124 F.4th at 228 (quoting *Bruen*, 537 U.S. at 24). As the Court explained:

> *Rahimi* did bless disarming (at least temporarily) physically dangerous people. The law that it upheld required "a finding that [the defendant] represents a credible threat to [someone else's] physical safety." 18 U.S.C. § 922(g)(8)(C)(i); 144 S. Ct. at 1894, 1896, 1898, 1901-02. It did so "because the Government

offer[ed] ample evidence" of a tradition of disarming people who "pose[ ] a clear threat of physical violence to another." *Id.* at 1898, 1901; *accord id.* at 1898 ("credible threat to the physical safety of others").

*Id.* at 230.  Consistent with this description, the Third Circuit joined the Sixth Circuit in

"refus[ing] to defer blindly to § 922(g)(1) in its present form." *Range II*, 124 F.4th at 230

(citing *Williams*, 113 F.4th at 658–661).  In *Williams*, the Circuit Court sorted felonies into

three categories:

> we hold today that § 922(g)(1) is constitutional on its face and as applied to dangerous people. . . . [Our Nation's] history reveals that legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous – so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous.  A person convicted of a crime is 'dangerous,' and can thus be disarmed, if he has committed (1) a crime 'against the body of another human being,' including (but not limited to) murder, rape, assault, and robbery, or (2) a crime that inherently poses a significant threat of danger, including (but not limited to) drug trafficking and burglary.  An individual in either of those categories will have a very difficult time, to say the least, of showing he is not dangerous. A more difficult category involves crimes that pose no threat of physical danger, like mail fraud, tax fraud, or making false statements.

*Williams*, 113 F.4th at 662-663.  Applying the recent developments in Second Amendment

law, the Third Circuit Court in *Range II* differentiated Rahimi from Range, finding that "the

Government does not try to justify disarming Range on this ground [physically dangerous

person], and with good reason: it has no evidence that he poses a physical danger to others

or that food-stamp fraud is closely associated with physical danger." *Range II*, 124 F.4th at

230.  *See also, id.* at 232 (finding the Government did not show a longstanding history and

tradition of depriving people like Range of their firearms because, in part, "the record

23

contains no evidence that Range poses a physical danger to others.").

In *Range II*, the Circuit Court also rejected the Government's argument that

"'legislatures traditionally used status-based restrictions' to disarm certain groups of people"

as support for finding a historical analogue to the situation faced by Range, reasoning that:

> Apart from the fact that those restrictions based on race and religion now would
> be unconstitutional under the First and Fourteenth Amendments, the
> Government does not successfully analogize those groups to Range. That
> Founding-era governments disarmed groups they distrusted like Loyalists,
> Native Americans, Quakers, Catholics, and Blacks does nothing to prove that
> Range is part of a similar group today. And any such analogy would be "far too
> broad[ ]." *See Bruen*, 597 U.S. at 31, 142 S.Ct. 2111 (noting that historical
> restrictions on firearms in "sensitive places" do not empower legislatures to
> designate any place "sensitive" and then ban firearms there).

*Range II*, 124 F.4th at 229-230.

Although the Third Circuit Court in *Range II* found that Range was not sufficiently

analogous to "groups [the founding-era governments] distrusted" simply by virtue of his

felony conviction, with particular focus on the lack of any evidence that Range posed a

physical danger to others, the same cannot be said of Handlovic. The defendant here is not

"like Range" nor does he fall within the "narrow" holding of *Range II*, *see id*. at 232. Range

was convicted of making a false statement to obtain food stamps in 1995, a misdemeanor

violation of state law, and was sentenced to three-years' probation, "which he completed

without incident." From 1995 through the date of the Circuit's decision in 2024, Range had

only "minor traffic and parking infractions and a summary offense for fishing without a

license." *Id*. at 222-223. Range sold his deer-hunting rifle in 1998 upon discovering that he

was legally barred from having a firearm due to his conviction, *id.* at 223, and, over twenty

years later, exercised lawful means to attempt to regain his ability to own a firearm, *i.e.* the

filing of a declaratory action in federal court challenging the constitutionality of § 922(g)(1)

as applied to him. *Cf. id.* at 277 ("Nearly thirty years have passed since Range's predicate

conviction – a non-violent offense involving a relatively small amount of funds – and besides

a single summary offense for fishing without a license and a few minor traffic infractions, all

evidence suggests that Range has been a law-abiding citizen in the intervening decades.

Importantly, Range has complied with § 922(g)(1) until this point, and the Government itself

concedes there is no evidence that Range is dangerous, violent, mentally unstable, or

poses a threat to himself or the public if his disability is lifted.") (Krause, J., concurring in

judgment).  Conversely, Handlovic was convicted of a felony involving illegal controlled

substances in 2008 and thereafter convicted of a second felony, escape, in 2010.  Despite,

as alleged in the Indictment, "knowing that he had been convicted of a crime punishable by

imprisonment for a term exceeding one year. . .", Handlovic did not use lawful means to

attempt to regain his right to possess a firearm and instead "knowingly possess[ed]" a

firearm and ammunition on or about July 4, 2024 (*see* Doc. 1).

      Historically, there is little evidence that the crime for which Range was convicted had

any clear founding-era analogue, and even if it did, that it was a crime a consequence of

which a person could be barred from the possession of a firearm.  However, the same

concerns underlying the lawful disarmament of "an individual [who] poses a clear threat of

physical violence to another", *Rahimi*, 602 U.S. at 698, support the prohibition of firearms by

felons convicted of crimes involving illegal controlled substances and escape, and in

particular the disarmament of felons who have repeatedly committed offenses disrupting the

orderly functioning of society and weakening society's ability to protect itself.

Applying "dangerousness", and specifically an individual's danger of causing

physical harm to others, as the touchstone in determining whether an individual can be

lawfully prohibited from possessing a firearm, it is evident that Handlovic's two prior felony

convictions, particularly when looked at together, fall within the categories of crimes which

permit the Government to disarm him where "he would likely pose a physical danger to

others if armed", *Pitsilides*, 128 F.4th at 210.

Courts have repeatedly found that felony crimes involving controlled substance

offenses qualify as "dangerous" for purposes of § 922(g)(1). For example, the *Pitsilides*

Court noted that "some offenses may offer conclusive evidence that someone poses" a

"special danger of misusing firearms", citing to the Fifth Circuit's decision in *United States v.*

*Bullock*, 123 4th 183 (5th Cir. 2024) (finding that due to Bullocks' prior "misuse[ of] a firearm

to harm others", he could be constitutionally dispossessed of a firearm) and the Sixth

Circuit's decision in *United States v. Williams* (differentiating between the "dangerous"

crimes and crimes "that inherently poses a significant threat of danger" including drug

trafficking and those crimes which "pose no threat of physical danger, like mail fraud, tax

fraud, or making false statements."). *See also*, *Range II*, 124 F.4th at 230 (characterizing

the Sixth Circuit's decision in *Williams* as "categorizing crimes as crimes against the person,

crimes like burglary and drug trafficking that 'pose a significant threat of danger', and

nondangerous ones."). While recognizing the need for "individualized factual findings" when

evaluating a declaratory judgment action challenging § 922(g)(1) as-applied, the Third

Circuit also cautioned against the application of a "constricted view of what makes a person

a sufficient danger to remain disarmed", noting that "both history and common sense reflect

that this 'dangerousness' includes not only direct involvement in physical violence."

*Pitsilides*, 128 F.4th at 212-213.

> For instance, "though residential burglary and drug dealing are not necessarily
> violent, they are dangerous because they often lead to violence." *Folajtar* [*v.
> Att'y Gen.*, 980 F.3d 897, 922] (Bibas, J., dissenting); *see also Williams*, 113
> F.4th at 659 (observing that legislatures may disarm those convicted of drug
> dealing or burglary because, while "[t]hese crimes do not always involve an
> immediate and direct threat of violence," they "may nonetheless pose a
> significant threat of danger," warranting disarmament).

*Id.* at 213.

In the past year, District Courts within the Third Circuit have also consistently found

that crimes involving controlled substances consist of crimes that pose a threat of danger to

others, rendering § 922(g)(1) constitutional as-applied to those individuals. *See e.g.*, *Lewis*

*v. United States*, 2025 WL 815408, at * 10 (D.N.J. 2025) ("Courts in this circuit have agreed

that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation as

applied to individuals, like Defendant, who have sustained prior felony convictions for drug

trafficking and firearms offenses.") (collecting cases); *United States v. Roach*, 2025 WL

871618, at * 2 (E.D. Pa. 2025) ("courts within the Third Circuit have determined that an underlying drug dealing conviction established a criminal defendant's dangerousness."); *United States v. Mollett*, 2025 WL 564885, at * 7 (W.D. Pa. 2025) (concluding that where Defendant had prior convictions for manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance and was found guilty of these offenses approximately two years before he allegedly possessed the firearms set forth in the Superseding Indictment, the Defendant "presented a special danger of misusing firearms, and was thus subject to disarmament under the Second Amendment."); *United States v. Birry*, 2024 WL 3540989, at * 8 (M.D. Pa. 2024) (explaining that drug crimes "threaten to cause great harm to society" and that Defendant's two past convictions for possession with intent to distribute methamphetamine "suggest that he poses or has posed a credible threat to public safety.  Although methamphetamine distribution did not concern legislatures at the time of the founding or after the Civil War, individuals like defendant were disarmed under historical analogues sufficient to withstand his as-applied challenge to Section 922(g)(1)."); *United States v. Trusty*, 2025 WL 830124, at * 5 (D.N.J. 2025).  This Court agrees with the reasoning of these district courts.

Even assuming Handlovic's prior felony offense for manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance, by itself, is insufficient to adequately demonstrate that he "pose[s] a credible threat to the physical safety of others", *Rahimi*, 602 U.S. at 693, Handlovic's subsequent conviction for escape

28

reinforces a finding that he poses a threat to the safety of others, including a special danger of misusing firearms. Commission of the crime of escape is a manifestation of a person's unwillingness to accept responsibility for offenses for which that person has been convicted. It further evidences a defiance of legal norms and the repeated inability to comply with the law. This violation, in conjunction with a prior controlled substance offense, form the basis for a finding that Handlovic "present[s] a credible threat to the physical safety of others" and therefore falls within the historical group of people who the Government has been traditionally permitted to disarm, *Rahimi*, 602 U.S. at 700.

This Court agrees with the Government's position that a number of historical statutes disarming individuals who were deemed dangerous or unlikely to abide by the law are proper historical analogues to § 922(g)(1), and specifically to § 922(g)(1)'s application to Handlovic (*see* Doc. 34, at 12-20). The analogue rests in the identification by the Government of persons who could be lawfully disarmed, specifically those who were deemed to present a threat to the physical safety of others, *Rahimi*, 602 U.S. at 693, 700, or a threat to "the orderly functioning of society", *Range*, 69 F.4th at 110, irrespective of the differences between those who were perceived to fit within that status at the time of the Founding and the ratification of the 14th Amendment and to Handlovic at present.

As a result of the foregoing analysis, the recent developments in Second Amendment law do not aid Handlovic in succeeding in his as-applied Constitutional challenge to § 922(g)(1). Although Handlovic is one of "the people" protected by the

Second Amendment and the plain text of that Amendment covers Handlovic's conduct of

possessing a firearm, the Government has affirmatively demonstrated that § 922(g)(1) is

consistent with this Nation's historical tradition of firearm regulation as-applied to this

defendant.

### III. CONCLUSION

For the reasons set forth herein, Defendant Lawrence Joseph Handlovic's Motion to

Dismiss the Indictment (Doc. 25) will be denied.   A separate Order follows.


Robert D. Mariani
United States District Judge